## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**UNITED STATES OF AMERICA,**
**THE STATE OF COLORADO, and**
**THE STATE OF TEXAS,**
**<u>ex</u> <u>rel.</u> KRYSTIN BUTLER,**
Plaintiffs,

v.

**MICHAEL KEITH CHISM II,**
**MILE HIGH PSYCHIATRY LLC,**
Defendants.

---

### *QUI TAM* COMPLAINT AND JURY DEMAND

---

The Relator, Krystin Butler, by and through her counsel, acting as a Relator on behalf of the United States of America, the State of Colorado and the State of Texas states the following Complaint against the Defendants:

### I.      INTRODUCTION

1.      This lawsuit is brought pursuant to the provisions of the federal False Claim Act ["FCA"], 31 U.S.C. § 3729, *et. seq.*, the Colorado Medicaid False Claims Act, C.R.S. § 25.5-4-303.5, *et. seq.* and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, *et. seq.* to recover monies which the United States, the State of Colorado and the State of Texas paid and/or did not recover because of the actions of the Defendants.

2.      This *qui tam* suit arises out of illegal schemes by Defendants to knowingly submit, or cause to be submitted, false claims or statements to certain government healthcare programs regarding the alleged provision of mental healthcare services.

3.      This action alleges that the Defendants submitted false and inflated billings for the provision of mental health care by nurse practitioners.  The scheme involved billing for CPT codes where the explicit requirements of the given CPT code had not been satisfied.  The Defendants also upcoded the evaluation and management ("E/M") codes several levels.  As is explained in detail in the complaint, where an appropriate E/M code should have been a level 2 (99212) or level 3 (99213), the Defendants were billing for level 4 (99214) or level 5 (99215).

4.      This action also alleges that the Defendants caused their nurse practitioners to unnecessarily and unreasonably prescribe and maintain the prescription of controlled substances, many of which were contraindicated in the prescribed combinations.  A significant component of the Defendants' business model was to draw in a large number of patients who were dependent upon drugs and to maintain those individuals as patients by unnecessarily and unreasonably providing them with inappropriate combinations and levels of highly addictive drugs.

5.      The principal events at issue transpired in the time period of approximately January 1, 2017 to the present and are believed to be ongoing.

## II.      PARTIES

6.      Relator Krystin Butler ("Butler") is a resident of Aurora, Colorado.

7.      The Defendant Michael Keith Chism II ("Chism") is an adult resident of the State of Colorado residing at 17667 E. Kettle Place, Centennial Colorado.

8.      The Defendant Mile High Psychiatry LLC ("MHP") is a Colorado limited liability company owned and controlled by Chism that maintains its principal place of business at 14221 East 4th Avenue, Suite 2-126, Aurora CO 80111.

9.      MHP also maintains an office in Texas located at 4545 Post Oak Place, Suite 110, Houston, TX.

10.     MHP also offers the services of its Colorado based nurse practitioners via telehealth in Texas as evidenced by the Psychology Today online advertisement found via this link:  https://www.psychologytoday.com/us/psychiatrists/medicaid/tx/houston/bunker-hill. Nurse practitioners Ashley Burns, Precious Barnes, Kelly Kilcrease, Sonata Poon, Kristen Wille, and Shawn Howard identified in this advertisement are employed by MHP and are based in Colorado.

### III.     JURISDICTION AND VENUE

11.     This action is brought on behalf of the United States Government under 31 U.S.C. § 3729, *et seq*., the FCA.  Butler brings this action under 31 U.S.C. § 3730(b) to recover for "false claims" which the Defendants knowingly presented, or caused to be presented, to the Government and/or concealed, or caused to be concealed, from the Government in violation of 31 U.S.C. § 3729(1)(A)-(B), (G) as amended May 20, 2009. This Court has jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

12.     *In personam* jurisdiction is appropriate in this district because the FCA provides for nationwide service of process. 31 U.S.C. § 3732(a).  In such circumstances, the relevant inquiry is whether a given defendant has sufficient contacts with the United States as a whole. *Appl. To Enforce Admin. Subp. of  S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996). The Defendants have significant presence in Colorado and have abundant national contacts.

13.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found or transact business in this district and/or because one or more of the acts proscribed by the False Claims Act occurred within this district.

## IV.   THE FALSE CLAIMS ACTS

### A.  The federal False Claims Act:

14.     The False Claims Act ("FCA") is the federal government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States.  See S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) reprinted in 1986 U.S.C.C.A.N 5266.

15.     The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153 and in 2009, and 2010, to enhance the ability of the Government to recover losses it sustained as the result of its payment of false claims.

16.     The FCA provides in pertinent part that any person who:

(A) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government;

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person. See also 28 C.F.R. § 85.3(a)(9) (setting forth the current civil penalties level of not less than

$5,500 and not more than $11,000 for violations of the FCA). For violations occurring on or after November 2, 2015, and for a penalty assessed after June 19, 2020 the civil penalty amounts range from a minimum of $11,665 to a maximum of $22,331. 28 C.F.R. § 85.5.

17.     The terms "knowing" and "knowingly," which comprise the FCA's scienter element, are defined at 31 U.S.C. § 3729(b)(1)(A) to mean a person who, with respect to relevant information:

> (i) has actual knowledge of the information;
>
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

18.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

19.     The FCA empowers private persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.

20.     The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**B.   The Colorado Medicaid False Claims Act:**

21.     Colorado's false claims act is largely patterned after the federal FCA.

22.     Like the federal FCA, the Colorado Medicaid False Claims Act imposes liability on any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" or who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"  Colo. Rev. Stat. 25.5-4-305(1)(a)-(b), (f).

23.     The Colorado Medicaid False Claims Act provides for treble damages and penalties consistent with the federal FCA and requires complaints to be filed under seal without service on the defendants. Colo. Rev. Stat. 25.5-4-305(1) and 25.5-4-306(2)(b).

**C.   The Texas Medicaid Fraud Prevention Act:**

24.     Texas' false claims is also patterned after the federal FCA.

25.     Like the federal FCA, the Texas Medicaid Fraud Prevention Act imposes liability on any person who "knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;"  "knowingly conceals or fails to disclose information that permits a person to

receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;" "makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;" or "knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program." Tex. Hum. Res. Code § 36.002.

26.     The Texas FCA also provides for treble damages and penalties consistent with the federal FCA and requires complaints to be filed under seal without service on the defendants. Tex. Hum. Res. Code § 36.052, § 36.102.

## V.     THE GOVERNMENT HEALTHCARE PROGRAMS AND THE PROVISION OF MENTAL HEALTHCARE SERVICES BY NURSE PRACTITIONERS

27.     Government Healthcare Programs or GHPs refers to healthcare programs paid for, in whole or in part, by federal or state funds.  They include:

### A.   The Medicare Part B program and its provision of mental healthcare services by nurse practitioners:

28.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1, 426A. Medicare is a 100% federally subsidized health insurance system.

29.     The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and

Medicaid Services (CMS) is part of HHS and is directly responsible for the administration of the Medicare program.

30.     CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as Medicare Administrative Contractors ("MAC's").  MAC's determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS.  See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

31.     Federal regulations impose a duty on a provider of services, such as MHP, to refund to the Government any funds the provider receives to which it is not entitled.   Such overpayment must be reported and returned within 60 days after the date on which the overpayment is identified or the date any corresponding cost report is due.  Any overpayment retained by a provider after the deadline for reporting and returning it is an "obligation" as defined by the FCA. 42 U.S.C. § 1320a-7k(d).

32.     Statutory interest must be paid with respect to improperly retained overpayments. 42 U.S.C. § 1395ddd(f).

33.     Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

34.     The Medicare program consists of four parts: A, B, C, and D. Medicare Part B (Medical Insurance) helps pay for medically necessary services.

35.     Counseling and therapy are mental health services covered by Medicare Part B. This includes visits with health care providers, including nurse practitioners, who accept assignment.

36.     For such mental health services, Medicare pays 80 percent of the Medicare approved amount and the Medicare beneficiary pays 20 percent of the Medicare approved amount, the Part B deductible and coinsurance costs.

37.     In order for a nurse practitioner ("NP") to be qualified to provide mental health services under Medicare, the NP must possess a master's degree in nursing, be a registered professional nurse ("RN") who is authorized by the State in which the services are furnished to practice as a nurse practitioner in accordance with State law and be certified as a nurse practitioner by a recognized national certifying body that has established standards for nurse practitioners. Medicare Benefit Policy Manual, Chapter 15, § 200(A).

38.     In order for the NP's mental health services to be covered by Medicare Part B, all of the following conditions must be met:

  a. The services are the type that are considered physician's services if furnished by a doctor of medicine or osteopathy (MD/DO);

  b. The services are performed by a person who meets Medicare's definition of a qualifying NP;

  c. The NP is legally authorized to perform the services in the State in which they are performed;

  d. They are performed in collaboration with an MD/DO; and

  e. The services are not otherwise precluded from coverage because of one of the statutory exclusions.

  *Id.,* § 200(B)(1).

39.     Collaboration is a process in which an NP works with one or more physicians (MD/DO) to deliver health care services, with medical direction and appropriate supervision as

required by the law of the State in which the services are furnished. In the absence of State law governing collaboration, collaboration is to be evidenced by NPs documenting their scope of practice and indicating the relationships that they have with physicians to deal with issues outside their scope of practice.  The collaborating physician does not need to be present with the NP when the services are furnished or to make an independent evaluation of each patient who is seen by the NP. *Id., § 200(D).*

40.     In order for a Medicare provided service to be reasonable and necessary, the service must be safe and effective; not experimental or investigational, and appropriate in terms of whether it is furnished in accordance with accepted standards of medical practice; furnished in a setting appropriate for the patient's medical needs and condition; ordered and furnished by qualified personnel; meets but does not exceed the patient's medical need; and is at least as beneficial as an existing and available medically appropriate alternative. See, CMS Pub. 100-08, Medicare Program Integrity Manual, Chapter 13, § 13.5.4.

41.     The NP's provision of mental health services are paid on an assignment basis and at 85% of the amount a physician gets under Medicare's physician fee schedule.   Medicare Claims Processing Manual, Chapter 12, § 120(A), 120.3(B).

42.     Assignment means the provider gets the Medicare allowed amount as payment in full for the provider's services and may not bill or collect from the patient any amount other than unmet copayments, deductibles and/or coinsurance.

43.     NPs must have their own "Nonphysician practitioner" national provider identification (NPI) number for Medicare billing purposes.  Medicare Claims Processing Manual, Chapter 12, § 120.3 (A).

**B.   Colorado Medicaid and its provision of mental health services by NPs:**

44.     The Social Security Act provides entitlement to medical services for individuals who meet eligibility requirements.  Title XVIII governs the Medicare Program.  Title XIX establishes the State Option Medical Assistance Program, also known as Health First Colorado. The Colorado Medical Assistance Act, C.R.S. 25.5.-4-101, provides the legal authority for the Health First Colorado Program.

45.     The Health First Colorado program is a state and federal partnership funded by the State of Colorado and federal matching dollars.  State funds are appropriated through the Colorado Legislature.  Federal funding is dependent upon compliance with federal guidelines.

46.     By statute, Health First Colorado pays for covered health care benefits for eligible members.  The Health First Colorado program is an entitlement program, which means that any person who meets the eligibility criteria is entitled to receive any medically necessary service covered by the program.

47.     To perform Health First Colorado benefit services and to receive Health First Colorado payments, providers must enroll in Health First Colorado. Enrolled providers must have and maintain licensure and certification required by Health First Colorado regulations.  All providers are assigned a Health First Colorado provider number.  The provider's NPI must be used to submit claims.

48.     Health First Colorado requires that the billing provider enter the NPI of the provider who actually performed or rendered the billed service to the Health First Colorado member.  Health First Colorado Outpatient Behavioral Health Fee-for-Service Manual, p. 24. See, www.Colorado.gov/pacific/hcpf/behavioral-health-ffs-manual.

49.     Health First Colorado provides Outpatient Behavioral Health services defined as a group of services designed to provide medically necessary behavioral health services to certain Health First Colorado members in order to restore these individuals to their highest possible functioning level.  Behavioral Health is split into two benefit categories: (1) Mental Health Services, and (2) Substance Use Disorder (SUD) services. Health First Colorado Outpatient Behavioral Health Fee-for-Service Manual, p. 3.

50.     For the provision of mental health services, eligible providers include masters level clinicians which includes advanced practice nurses.  *Id.*

51.     The term "advanced practice nurse" includes nurse practitioners or NPs.

52.     Per C.R.S. § 12-255-104(1), an "advanced practice registered nurse" is a registered professional nurse who is licensed to practice in accordance with the Nurse and Nurse Aide Practice Act, who obtains specialized education or trainings as provided in section 12-255-111 and who applies to and is accepted by the state board of nursing for inclusion in the advanced practice registry established pursuant to section 12-255-111.

53.     C.R.S. § 12-255-111 provides for the establishment of an advanced practice registry, directs the board of nursing to establish reasonable criteria for designation of specific role and population foci based on currently accepted professional standards, and provides that a registered professional nurse who is included in the advanced practice registry has the right to use certain titles, if authorized by the board of nursing, including the title of "nurse practitioner" or "N.P."

54.     The Nursing Rules and Regulations promulgated by the Board of Nursing, found at 3 CCR 716-1, in § 1.14(C)(2) state that an Advanced Practice Registered Nurse (APRN) is a master's prepared nurse holding a graduate degree in advanced practice registered nursing who

has completed a graduate or post-graduate program of study in an advanced role and/or population focus, in an accredited advanced practice registered nursing program and has been recognized and included on the Advanced Practice Registry by the nursing board.  APRN roles recognized by the nursing board are nurse practitioner (NP), certified registered nurse anesthetist (CRNA), certified nurse midwife (CNM) and clinical nurse specialist (CNS).

55.     Health First Colorado's regulations regarding Physician Services, found at 10 CCR 2505-10 8.200, specifically § 8.200.2.B, provide that Advanced Practice Nurses may provide and order covered goods and services in accordance with their scope of practice without a physician order.

56.     Health First Colorado uses CMS's Healthcare Common Procedural Coding System (HCPCS) to identify services provided to Health First Colorado members.  The HCPCS includes codes identified in the Physician's Current Procedural Terminology (CPT) and codes developed by CMS.

57.     The codes used for submitting claims for mental health services provided to Health First Colorado members represent services that are approved by CMS and that may be provided by an enrolled Health First Colorado member.  The CMS HCPCS is divided into two principal subsystems, referred to as level I and level II of the HCPCS. Health First Colorado Outpatient Behavioral Health Fee-for-Service Manual, p. 18.

58.     Level I of the HCPCS is comprised of Current Procedural Terminology (CPT), a numeric coding system maintained by the American Medical Association (AMA). The CPT is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals. Level II of the HCPCS is a standardized coding system that is used primarily

to identify products, supplies, and services not included in the CPT codes, such as ambulance services and durable medical equipment. *Id.*

59.     HIPAA requires providers to comply with the coding guidelines of the AMA CPT Procedure Codes and the International Classification of Disease, Clinical Modification Diagnosis Codes. If there is no time designated in the official descriptor, the code represents one unit or session. Providers should regularly consult monthly bulletins in the Provider Services Bulletins section. *Id.*

### C.   Texas Medicaid and its provision of mental health services by NPs:

60.     Texas Medicaid also authorizes APRNs, which includes NPs, to provide the equivalent of physician services, provided the services are within the scope of practice of the APRN, are consistent with the Texas Board of Nursing's rules and regulations and would be covered by Medicaid if provided by a licensed physician (M.D. or D.O.).  Texas Administrative Code, Title 1, Part 15, Chapter 354, Subchapter A, Division 24, Rule § 354.1331.

61.     Texas Medicaid will reimburse NPs for professional services at 92% of the reimbursement rate for the same professional service paid to a physician (M.D. or D. O.) Texas Administrative Code, Title 1, Part 15, Chapter 355, Subchapter J, Division 15, Rule § 355.8281.

62.     Texas Medicaid also requires its providers to submit their claims in compliance with CPT and CMS's HCPCS guidelines as defined by the American Medical Association and the CMS coding manuals. Texas Medicaid Provider Procedures Manual, July 2020, Volume 1, Section 6, Claims Filing, § 6.4.1.2

63.     With respect to E/M codes, Texas also directs its providers to follow the 1995 or 1997 Documentation Guidelines for Evaluation and Management Services published by CMS when selecting the level of service provided.  Texas Medicaid Provider Procedures Manual, July

2020, Volume 2, Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook, § 9.2.56.

## VI.  THE CPT CODES AT ISSUE IN THIS CASE:

64.     This case alleges that the Defendants knowingly and falsely employed certain mental health related CPT codes to falsely bill certain GHPs.  The Defendants' practices included improperly combining or stacking certain CPT codes and upcoding other CPT codes.

65.     The CPT codes most commonly misused by the Defendants include Codes 90785, 90833, 90836, 90887, H0032, 99214 and 99215.

66.     **90785:** Code 90785 is an add-on code used to report interactive complexity.  The code should be listed separately in addition to the code for the primary service.  Interactive complexity refers to specific communication factors that complicate the delivery of a psychiatric procedure. Some common factors include more difficult communication with discordant or emotional family members and engagement of young and verbally undeveloped or impaired patients. Patients that require this service are those who have third parties such as parents, guardians, other family members, interpreters, language translators, agencies, court officers, or schools involved in their psychiatric care (see Appendix H for more information). This code is to be reported in conjunction with codes for diagnostic psychiatric evaluation (90791, 90792), psychotherapy (90832-90834-90837), psychotherapy when performed with an evaluation and management service (90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350), and group psychotherapy (90853).  The minimum documentation requirements include clearly defining the means of interactive complexity.  Source: Colorado Department of Human Services 2017 Uniform Service Coding Standards Manual (USCSM), p. 65.

67.     Appendix H to the Colorado 2017 USCSM, found at page 415, provides more detail regarding Code 90785.  It explains that interactive complexity is often present with patients who have others involved in their care such as guardians, interpreters, child welfare agencies, parole or probation officers or schools. At least one of the following communication factors must be present during the visit:

a.      The need to manage maladaptive communication (related to e.g., high anxiety, high reactivity, repeated questions, or disagreement) among participants that complicates delivery of care;

b.      Caregiver emotions or behaviors that interfere with implementation of the treatment plan;

c.      Evidence or disclosure of a sentinel event and mandated report to a third party (e.g., abuse or neglect with report to a state agency) with initiation of discussion of the sentinel event and/or report with patient and other visit participants; or

d.      Use of play equipment, physical devices, interpreter or translator to overcome barriers to diagnostic or therapeutic interaction with a patient who is not fluent in the same language or who has not developed or lost expressive or receptive language skills to use or understand typical language.

68.     The July 2020 USCSM states the same instructions for Code 90785.  See page 52, and Appendix F found at page 368.

69.     **90833:** Code 90833 is a psychotherapy add-on to be employed when a mental health provider provides 30 minutes of psychotherapy with the patient in addition to an evaluation and management service.  The 90833 add-on is to be listed separately in addition to the code for the primary service. The service description states:  Face-to-face psychotherapy with

a patient provided on the same day as an Evaluation and Management service by the same prescriber. <u>The two services must be significant and separately identifiable</u>. If a family member is present, the focus of the session is still on the patient and not on the family unit."  Colorado 2017 USCSM, p. 73. (emphasis supplied).   The minimum documentation requirements include specifying: "1. The reason for the visit. What was the intended goal or agenda? How does the service relate to the treatment/service plan? 2. Description of the service; 3. The therapeutic intervention(s) utilized and the individual's response to the intervention(s); 4. How did the service impact the individual's progress towards goals/objectives; and 5. Plan for next contact(s) including any follow-up or coordination needed with 3rd parties."  *Id.*

70.     The July 2020 USCSM provides the same instructions for Code 90833.  See p. 60.

71.     CMS provides more information regarding the correct use of Code 90833 and embellishes on what the Colorado USCSM language of "significant and separately identifiable" means.  In MLN Matters Number SE1407 re-issued on March 18, 2014[1] ("SE1407"), page 2, CMS explains that the main error CMS had identified with revised psychotherapy codes is the provider not clearly documenting the amount of time spent only on psychotherapy services: "The correct E&M code selection must be based on the elements of the history and exam and medical decision making required by the complexity/intensity of the patient's condition. The psychotherapy code is chosen on the basis of the time spent providing psychotherapy.  When a beneficiary receives an Evaluation and Management Service (E&M) service with a psychotherapeutic service on the same day, by the same provider, both services are payable if they are significant and separately identifiable and billed using the correct codes. … An add-on

---

[1] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/SE1407.pdf

code is eligible for payment only if reported with an appropriate primary service performed on the same date of service. <u>Time spent for the E&M service is separate from the time spent providing psychotherapy and time spent providing psychotherapy cannot be used to meet criteria for the E&M service.</u> **Because time is indicated in the code descriptor for the psychotherapy CPT codes, it is important for providers to clearly document in the patient's medical record the time spent providing the psychotherapy service rather than entering one time period including the E&M service**." <u>(Underlining supplied for emphasis).</u>

72.     CMS publication SE1407 also explains that Code 90833 covers psychotherapy provided in the range of 16 to 37 minutes.  It also instructs that psychotherapy codes should not be billed for sessions lasting less than 16 minutes. Page 3.

73.     **90836:** Code 90836 is an add-on code that is essentially identical to Code 90833, with the exception that it is intended to apply to 45 minutes of psychotherapy. Source: Colorado 2017 USCSM, p. 77; Colorado July 2020 USCSM, p. 63.  SE1407 identifies that Code 90836 covers psychotherapy provided in the range of 38 to 52 minutes. Page 3.

74.     **90887:**  The service description for Code 90887 states: "The treatment of the patient requires explanation(s) to the family, employer(s), or other involved persons to obtain their support and/or participation in the therapy/treatment process. The provider interprets the results of any psychiatric and medical examinations and procedures, as well as any other pertinent recorded data, and spends time explaining the patient's condition. Advice is also given as to how the family and other involved persons can best assist the patient."   The procedure code description is: "Interpretation or explanation of results of psychiatric, other medical examinations and procedures, or other accumulated data to family or other responsible persons, or advising them how to assist patient." The notes state: "The services provided for procedure code 90887

are considered separate and distinct from the work involved in psychotherapy (see psychotherapy procedure codes) as they have to do with explaining results of testing or an exam to family or other responsible person." The minimum documentation requirements include: "1. The reason for the visit/call. What was the intended goal or agenda? How does the service relate to the treatment/service plan? What is the clinical need for specific testing; 2. Description of the service provided and patient response; 3. Summary of test results, interpretation of test results, discussion with individual about results; and 4. Treatment recommendations." Source Colorado 2107 USCSM, p. 99; Colorado July 2020 USCSM, p. 89.

75.     **H0032:** The service description for Code H0032 is: "Activities to develop, evaluate, or modify a patient's treatment/service plan, including the statement of individualized treatment/service goals, clinical interventions designed to achieve goals, and an evaluation of progress toward goals. The treatment/service plan is reviewed by the clinician and clinical supervisor, and revised with the patient as necessary or when a major change in the patient's condition/service needs occurs." The procedure code description is: "Mental health service plan development by non-physician." The notes provide: "H0032 is used in lieu of individual psychotherapy procedure codes (see psychotherapy procedure codes) when the focus of the session is on treatment/service planning and no psychotherapy occurs during the session. Use a psychotherapy code if more than 50% of the session is psychotherapy." The minimum documentation requirements are: "1. The reason for the visit. What was the intended goal or agenda? 2. Description of the service (should include discussion of treatment/service plan development). 3. Completion of or substantial progress toward plan development including required signatures according to agency policies. 4. Treatment/service plan revisions should include progress and/or completion of goals. 5. Plan for next contact(s) including any follow-up

or coordination needed with 3rd parties." Source: Colorado 2017 USCSM, p. 236; Colorado July 2020 USCSM, p. 234.

76.     **E/M Codes 99214 and 99215:** Codes 99214 and 99215 are part of a code scheme that provides for the billing of evaluation and management (E/M) services by a broad range of health care providers. Codes 99212-99215 apply to the provision of E&M services to established patients in an office or other outpatient setting.

77.     Medicare and Medicaid providers have been provided with extensive instructions on how to properly bill E/M services. For example, Health First Colorado providers were instructed in Colorado's 2017 USCSM, at pages 53-54, to employ CMS' 1995[2] or 1997[3] published guidelines to determine the correct E/M code to apply. Further at Appendix I, pages 416-432 of the 2017 Colorado USCSM, the providers were provided with extensive instructions and examples to properly determine the correct E/M code. These instructions from Health First Colorado did not materially change through December 31, 2020. See Colorado's July 2020 USCSM at pages 34-35, Appendix G, pages 369-382.

78.     The determination of which code applies to a given level of E/M services is driven by predominantly four factors: history, exam, medical decision making and the amount of time. For the codes 99212-99215, two of the three categories of history, exam and/or medical decision making must be satisfied. This relationship is illustrated by the following chart:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| 99212- Estb. Patient Level 2 | Problem focused | Problem focused | Straightforward | 10 min |

---

[2] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/95Docguidelines.pdf
[3] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/97Docguidelines.pdf

| 99213- Estb. Patient Level 3 | Expanded problem focused | Expanded problem focused | Low complexity | 15 min |
|---|---|---|---|---|
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40 min |

Source: Colorado 2107 USCSM at 426; Colorado July 2020 USCSM at 377.

79.     However, in the circumstance where counseling and/or coordination of care occupies more than 50% of the encounter, then the determination is driven solely by the amount of time.  See, 2017 USCSM at page 422.  Counseling is described in the 2017 Colorado USCSM as: "[i]nteraction with patient (and family) to discuss: diagnosis or recommended further work-up, prognosis, alternative management plans and associated risk or potential outcomes, instructions for management or follow-up, education including need for compliance, and risk factor reduction."  The 2017 USCSM comments that:  "[c]ounseling is only used to determine the level of E&M code (although it should always be documented) when it (along with coordination of care) consists of more than 50% of the time spent in the encounter. Medicare usually requires a face-to-face interaction that includes the patient. Documentation should include a description of the content, time spent counseling and total time of the encounter."  2017 Colorado USCSM at 425.

80.     Coordination of care means contact with other physicians or caregivers on behalf of the patient in the management of treatment, with the patient present. *Id.*

81.     With respect to the first E/M component, History, the 1995 CMS E/M guidelines identify that the type of history is based on the following elements: chief complaint, history of present illness, review of systems and past, family and/or social history.  Indication that the chief complaint was discussed is required for each type of history.  The following chart from page 4 of the 1995 CMS E/M guidelines illustrates the relationship of the other three elements to the

determination of the type of history.  To qualify for a given type of history, all three elements in the table must be met:

| History of present illness (HPI) | Review of systems (ROS) | Past, family and/or social history (PFSH) | Type of history |
|---|---|---|---|
| Brief | N/a | N/a | Problem focused |
| Brief | Problem pertinent | N/a | Expanded problem focused |
| Extended | Extended | Pertinent | Detailed |
| Extended | Complete | Complete | Comprehensive |

82.     With respect to "history of present illness," or "HPI" it includes the following elements: location, quality, severity, duration, timing, context, modifying factors and associated symptoms.  A brief HPI consists of one to three of the HPI elements.  An extended HPI consists of four or more of the elements. 1995 CMS E/M guidelines at p. 6.

83.     "Review of systems" or "ROS" is an inventory of body systems obtained through a series of questions seeking to identify signs and/or symptoms which the patient may be experiencing or has experienced.  A "problem pertinent" ROS inquires about the system directly related to the problem identified in the HPI.  An "extended" ROS inquires about the system directly related to the problem and a limited number of additional systems. A "complete" ROS inquires about the system(s) directly related to the problem(s) identified in the HPI plus all additional body systems.  *Id.* at 6-8.  The patient's positive responses and pertinent negatives for the system(s) reviewed should be documented.

84.     "Past, family and/or social history" or "PFSH" consists of a review of three areas: (1) past history- reviewing the patient's past experiences with illnesses, operations, injuries and treatments; (2) family history- reviewing medical events in the patient's family; and (3) social history – an age appropriate review of past and current activities.  A "pertinent" PFSH is a

review of the history area directly related to the problem identified in the HPI. At least one specific item from any of the three history areas must be documented.  A "complete" PFSH requires that one specific item from two of the three history areas must be documented. *Id.* at 8.

85.     With respect to the second E/M component, Exam, in the circumstances of mental health care, CMS and Health First Colorado have provided practitioners with rules that are specific to mental health services.  See, Colorado 2017 USCSM at p. 423; 1997 CMS E/M Guidelines at p. 38-39.   These rules identify by bullet points various elements of examination broken down into the categories of constitutional, musculoskeletal and psychiatric.  The constitutional and psychiatric bullet points are contained within a shaded border.  The musculoskeletal bullet points are not within a shaded border.  The following chart identifies the number of bullet points that must be performed and documented to qualify for a certain level of exam:

| Level of Exam | Perform and Document |
|---|---|
| Problem focused | One to five elements identified by a bullet |
| Expanded problem focused | At least six elements identified by a bullet |
| Detailed | At least nine elements identified by a bullet |
| Comprehensive | Perform all elements identified by a bullet; document every element in each box with a shaded border and at least one element in each box with an unshaded border |

86.     The third E/M component, Medical Decision Making, or "MDM" refers to the complexity of establishing a diagnosis and/or selecting a management option as measured by:

a.     The number of possible diagnosis and/or the number of management options that must be considered;

b.     The amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed, and analyzed; and

c.   The risk of significant complications, morbidity, and/or mortality, as well as comorbidities associated with the patient's presenting problem(s), the diagnostic procedure(s) and/or the possible management options.

CMS 1995 E/M Guidelines at p. 11.

87.     The following chart shows the progression of the elements required for each level of medical decision making.  To qualify for a given type of MDM, two of the three elements in the table must be met or exceeded:

| Number of diagnoses or management options | Amount and/or complexity of data to be reviewed | Risk of complications and/or morbidity or mortality | Type of decision making |
|---|---|---|---|
| Minimal | Minimal or none | Minimal | Straightforward |
| Limited | Limited | Low | Low complexity |
| Multiple | Moderate | Moderate | Moderate complexity |
| Extensive | Extensive | High | High complexity |

CMS 1995 E/M Guidelines at p. 11.

88.     The number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis and the management decisions that are made by the provider. Generally, decision making for a diagnosed problem is easier than for an identified but undiagnosed problem. The number and type of diagnostic tests employed may be an indicator of the number of possible diagnoses. Problems which are improving or resolving are less complex than those which are worsening or failing to change as expected. The need to seek advice from others is another indicator of complexity of diagnostic or management problems. CMS 1995 E/M Guidelines at 11-12.

89.     The amount and complexity of data to be reviewed is based on the types of diagnostic testing ordered or reviewed. A decision to obtain and review old medical records and/or obtain history from sources other than the patient increases the amount and complexity of data to be reviewed.  Discussion of contradictory or unexpected test results with the physician who performed or interpreted the test is an indication of the complexity of data being reviewed. The amount and complexity of the data reviewed or to be reviewed should be well documented. *Id.* at 12-13.

90.     The risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problem(s), the diagnostic procedure(s), and the possible management options. *Id.* at 14-15.

## VII. THE DEFENDANTS' DUTY TO UNDERSTAND THE LAW

91.     Those who deal with the federal government, and in particular, those who seek compensation from the federal government, must use due care to ensure that when they request payment from the government they are legally entitled to receive that compensation. Every person who deals with the federal government is presumed to know the law.  *See, e.g., Cheek v. United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 609, 112 L. Ed. 2d 617 (1991); *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); *United States v. Aquino-Chacon*, 109 F.3d 936, 938 (4th Cir. 1997).

92.     Failure to adequately familiarize oneself with the legal requirements for government compensation is evidence of reckless disregard. *See United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001).

93.     Furthermore, when an individual or entity is confused by the legal requirements of a regulation, it has "some duty to make a limited inquiry so as to be reasonably certain they

25

are entitled to the money they seek." *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). The unique circumstances of each case dictate the extent of the duty to inquire. *Id.*

## VIII.        THE IMPROPER CONDUCT OF THE DEFENDANTS

### A.  Background:

94.     The allegations of the Defendants' improper conduct are based on the direct and independent knowledge of Relator Butler.

95.     Relator Butler worked for the Defendant MHP as a compliance manager from approximately June of 2019 until approximately December of 2020 auditing patient charts and billing codes.

96.     MHP is a business wholly owned and controlled by Chism.

97.     MHP has three offices, two in Colorado and one in Houston, Texas.

98.     Approximately sixteen NPs work for MHP. Physicians do not work in the Colorado offices.  Texas requires physician supervision of NPs, so the Texas MHP office works in association with a physician, William Goldman, M.D.

99.     MHP offers the services of most of its NPs via telecommunication to residents of Colorado and Texas.

100.     Medicaid patients dominate MHP's practice.  52% of MHP's patient base is insured by Medicaid.  Approximately 80% of the billing is to Medicaid.  From January, 2020 through November, 2020, approximately $16 million was billed by MHP to Colorado and Texas Medicaid.

101.     During the time that Butler worked for MHP she observed that Chism, the sole owner of MHP, dominated and controlled the actions of MHP and its personnel.

102.     Chism is independently liable for the acts and omissions of MHP by virtue of his individual acts as well as the fact that he dominated and controlled MHP.

103.     And, MHP is liable for Chism's actions and the actions of all of its officers, directors, agents and employees.

104.     During the time that Butler worked for Mile High, she had direct conversations and interactions with Chism and other Mile High personnel regarding the matters at issue.  Butler also had access on a regular basis to the patients' charts and their billing records.

105.     Butler also reviewed patient charts and billing records as far back as 2017 and observed the same fraudulent practices complained of herein.

106.     Butler, as well as the team with whom she worked, had little experience with patient bill coding or the type of patient chart and bill auditing they were performing.

107.     Chism intentionally hired inexperienced and uneducated individuals to perform these coding and auditing functions.

108.     These individuals were dependent on the instructions and advice Chism gave them.  These individuals had little idea about what they were doing or how accurately the respective CPT codes were being applied or billed.  They simply followed Chism's firm instructions.

109.     Chism knowingly failed to ensure that the providers and the personnel responsible for billing and auditing had the proper education, training, experience and resource materials to accurately bill for the services MHP provided.

110.     Chism instructed the personnel of MHP to falsely code and bill.  For example, with respect to code H0032, Chism instructed the providers, the coders and the auditors to bill

this charge every 30 days, regardless of whether the precise requirements of code H0032 had been met.

111.    Chism also instructed the MHP providers to always indicate that the provider had administered at least 16 minutes of psychotherapy so that code 90833 could be billed. Most of the MHP providers, who had historically only dealt with medication management, found this request to be inappropriate.

112.    For a significant amount of the time between 2017 and the present, the clinic sessions were scheduled on 15 minute intervals so the total time the MHP providers saw a given patient did not exceed 15 minutes.

113.    Chism and MHP regularly engaged in the practice of altering a patient's chart to justify a given billing code.

114.    Many of the MHP providers acknowledged to Butler that a given patient visit was devoted to medication management and not to the provision of any meaningful psychotherapy. As the ten charts identified below evidence, even though the provider claimed to have spent at least 16 minutes providing psychotherapy, the charts were devoid of any lengthy details that documented the alleged dialogs between the provider and the patient regarding psychotherapy. Instead, the charts just contain general statements about the provision of psychotherapy like coping skills were discussed, supportive therapy was provided and the importance of lab work was discussed.

115.    The patient's charts did not meet the minimum documentation requirements of the CPT psychotherapy codes like code 90833. See, July 2020 Colorado USCSM at page 59. Instead, the chart's brief comments about psychotherapy appear more consistent with the provision of E/M services.

28

116.     With respect to code 90785, Chism instructed the MHP personnel to always bill this code anytime there was anything that occurred during a clinic session that caused a distraction such as children in the background or the patient was driving in a car, regardless of whether the precise requirements of code 90785 had been met.

117.     With respect to code 90887, Chism instructed the MHP personnel to always bill this code anytime someone else attended the clinic session with the patient, regardless of whether the precise requirements of code 90887 had been met.

118.     With respect to the E/M codes, Chism instructed the MHP personnel to always bill at least a Level 4 charge, such as 99204 and 99205 for new patients and 99214 and 99215 for existing patients, regardless of whether the precise requirements of these E/M codes had been met.

119.     In fact, Chism's standing instruction was that if someone billed Level 3 for E/M services (Codes 99203 or 99213), he was to be provided the patient's chart and bill.  Generally, Chism would review the chart and bill and disapprove the Level 3 status.  Chism would then send the chart back to the provider with the instruction that the provider was supposed to add more documentation to the chart so that a Level 4 or Level 5 E/M charge could be billed.

120.     In addition, at times, the patient's chart was altered by someone other than the provider to bolster MHP's claim for payment.

121.     Over time, Butler educated herself regarding the proper standards for billing E/M services.  As Butler became more educated, she began to realize that Chism and MHP were defrauding the respective private health insurance companies and GHPs they were billing.

122.     Butler learned and appreciated that the Defendants were engaged in a large scale scheme to falsely bill the private health insurance companies and GHP payors by uniformly

upcoding on certain charges, like the E/M charges, and adding to the patient's bills inappropriate charges like codes 90785, 909887 and H0032.

123.    Butler also learned via her discussions with the MHP NPs that Chism was forcing them to maintain the prescriptions of unnecessary controlled medications like combining a stimulant like Adderall with certain benzodiazepines like Xanax, Ativan or Valium.  The providers complained that they were then required to see the patients on an unnecessarily frequent basis.

124.    The providers also complained that the maintenance of these controlled substances was occurring without the patient undergoing the reasonable and necessary tests and screenings required by the applicable standard of care.

125.    One experienced NP, Kim Cotton, was fired by Chism because she complained of this practice of unnecessarily prescribing certain combinations of controlled substances.

126.    Chism at times also inappropriately billed the services of a given NP under his NPI number.  For example, with reference to the patient examples below, on April 7, 2020 Patient 2 was seen by NP Ashley Burns.  Yet, when the MHP was submitted to Health First Colorado it claimed that Chism was the provider. Similarly, on March 31, 2020 Patient 4 was seen by Np Ashley Burns yet Chism represented on the bill to Health First Colorado that he was the provider.

**B.  Patient Examples:**

127.    The following patient examples provide evidence of the Defendants' knowingly false billing of GHPs.

128.    **Patient 1** is a 31 year old female who was seen at MHP by Kristen Wille APRN ("Wille") on June 11, 2020.  The total time of the encounter was 30 minutes of which 16+

minutes were attributed to providing psychotherapy, which left less than 14 minutes for the provision of E/M services.   The purpose of the visit was to follow up and refill the patient's medications.  MHP billed Health First Colorado on July 13, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

129.     To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any revisions or modifications to the patient's treatment plan.

130.     It is claimed that 16+ minutes were dedicated to the provision of psychotherapy. The chart simply states: "16+ minutes of therapy discussing: coping skills used for situational stress and increased anxiety, medication management moving forward." Arguably the "psychotherapy" was really just E/M services.  These notes do not comply with the minimum documentation requirements for billing code 90833.

131.     Patient 1's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

132.     More accurately the visit only qualified for CPT code 99212. With respect to the patient's history, the HPI was "brief," no ROS was documented so the ROS component was "n/a," no PHSH was documented so that component was "n/a," so the type of history was "problem focused."  With respect to the exam component, no exam was documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were stable and Wille simply continued the patient's medications.   There was no documentation of any data that needed to be reviewed so that

component was "minimal or none." And, the risk of complications or morbidity was "minimal." So the type of MDM was "straightforward."

133. Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 1's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| **99212- Estb. Patient Level 2** | **Problem focused** | **Problem focused** | **Straightforward** | 10 min |
| 99213- Estb. Patient Level 3 | Expanded problem focused | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

134. **Patient 2** is a 23 year old female who was seen at MHP by Ashley Burns APRN ("Burns") on April 7, 2020.  The total time of the encounter was 22 minutes of which 16+ minutes were attributed to providing psychotherapy, which left less than 6 minutes for the provision of E/M services.   The purpose of the visit was for routine follow up for management of the patient's attention deficit hyperactivity disorder (ADHD), major depressive disorder (MDD) and general anxiety disorder (GAD). MHP billed Health First Colorado on July 20, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.  The bill was falsely submitted under Chism's NPI number as opposed to Burns' NPI number.

135. To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any revisions or modifications to the patient's treatment plan.

136.    It is claimed that 16+ minutes were dedicated to the provision of psychotherapy. Patient 2's chart sates: "16 + minutes devoted exclusively to psychotherapy today in the form of behavioral and cognitive therapy discussing: new job and celebrating successes, family struggles (elected to postpone adoption of Ana), preparing for upcoming move and navigating challenging family dynamics with brother in law and cousin in law, sleep hygiene." These notes do not comply with the minimum documentation requirements for billing code 90833.

137.    Patient 2's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

138.    More accurately the visit only qualified for CPT code 99212.  With respect to the patient's history, the HPI was "extended," no ROS was documented so that component was "n/a" and the PHSH was "complete," so the type of history was "problem focused" because all three elements must be met.  With respect to the exam component, 9+ bullet points were documented, so the type of exam was "detailed." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were stable, improving or well controlled and Burns simply continued the patient's medications.   There was no documentation of any data that needed to be reviewed so that component was "minimal or none." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "straightforward."

139.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 2's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| 99212- Estb. Patient Level 2 | Problem focused | Problem focused | Straightforward | 10 min |

| 99213- Estb. Patient Level 3 | Expanded problem focused | Expanded problem focused | Low complexity | 15 min |
|---|---|---|---|---|
| 99214- Estb. Patient Level 4 | Detailed | **Detailed** | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

140.    **Patient 3** is a 22 year old female who was seen remotely by Sonata Poon APRN ("Poon") on September 2, 2020.  The total time of the encounter was 30 minutes of which 16 minutes were attributed to providing psychotherapy, which left less than 14 minutes for the provision of E/M services.   The purpose of the visit was for follow up for management of the patient's attention deficit hyperactivity disorder (ADHD), and general anxiety disorder (GAD). MHP billed Health First Colorado on September 10, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

141.    To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any revisions or modifications to the patient's treatment plan.

142.    It is claimed that 16 minutes were dedicated to the provision of psychotherapy. The chart simply states: "Provided psychotherapy for _16__ mins applying the following therapeutic maneuver: Supportive Therapy which reinforces your ability to cope with stress and difficult situation."  These notes do not comply with the minimum documentation requirements for billing code 90833.

143.    Patient 3's chart does not support MHP's claim that the E/M services were provided at a level that justified claiming CPT code 99215.

144.    More accurately the visit only qualified for CPT code 99212.  With respect to the patient's history, the HPI was "extended," no ROS was documented, but credit is provided

34

for the documented psyche history, so the ROS was "problem pertinent" and the PHSH was "complete," so the type of history was "expanded problem focused" because all three elements must be met.  With respect to the exam component, no bullet points were documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were improving and Poon simply continued the patient's medications, with one exception where she increased the Concerta.   Labs were ordered but not reviewed, so the data component was "minimal or none." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "straightforward."

145.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 3's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|------|---------|------|-------------------------|------|
| **99212- Estb. Patient Level 2** | Problem focused | **Problem focused** | **Straightforward** | 10 min |
| 99213- Estb. Patient Level 3 | **Expanded problem focused** | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

146.    **Patient 4** is a 29 year old male who was seen by Burns on March 31, 2020.  The total time of the encounter was 20 minutes of which 16+ minutes were attributed to providing psychotherapy, which left less than 4 minutes for the provision of E/M services.   The purpose of the visit was for follow up for management of the patient's MDD, anxiety, PTSD and insomnia. MHP billed Health First Colorado on July 20, 2020 claiming CPT codes 99215, H0032 and

90833 for a total of $410.00.  The CMS 1500 form was falsely submitted to Health First

Colorado using Chism's NPI number as opposed to Burns' NPI number.

147.     To begin with, the use of CPT code H0032 was false as more than 50% of the

encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do

not reflect any significant revisions or modifications to the patient's treatment plan.

148.     It is claimed that 16+ minutes were dedicated to the provision of psychotherapy.

Patient 4's chart states: "16+ minutes of therapy in the form of: Supportive Therapy which

reinforces your ability to cope with stress and difficult situation- discussed coping mechanisms

for depression and importance of EMDR for PTSD and past traumas. discussed importance of

lab work for high risk medications- advised him to eat before getting blood drawn due to hx of

fainting." These notes do not comply with the minimum documentation requirements for billing

code 90833.

149.     Patient 4's chart does not support MHP's claim that E/M services were provided

at a level that justified claiming CPT code 99215.

150.     More accurately the visit only qualified for CPT code 99213.  With respect to

the patient's history, the HPI was "extended," no ROS was documented, but credit is provided

for the documented psyche history, so the ROS was "problem pertinent" and the PHSH was

"complete," so the type of history was "expanded problem focused" because all three elements

must be met.  With respect to the exam component, 8 bullet points were documented, so the type

of exam was "expanded problem focused." And with respect to the MDM component, the

number of diagnoses or management options were "limited" as the patient's diagnoses had been

previously established, the patient's symptoms were improving or stable and Burns simply

continued the patient's medications.   Labs were ordered but not reviewed, so the data

component was "minimal or none." And, the risk of complications or morbidity was "minimal." So the type of MDM was "straightforward."

151.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 4's services only qualified for use of the 99213 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| 99212- Estb. Patient Level 2 | Problem focused | Problem focused | **Straightforward** | 10 min |
| **99213- Estb. Patient Level 3** | **Expanded problem focused** | **Expanded problem focused** | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

152.    **Patient 5** is a 30 year old female who was seen by Kelly Kilcrease APRN ("Kilcrease") on July 29, 2020.  The total time of the encounter was 26 minutes of which 16 minutes were attributed to providing psychotherapy, which left 10 minutes for the provision of E/M services.   The purpose of the visit was for a routine follow up of the patient's depression and anxiety and review of medications. MHP billed Health First Colorado on August 4, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

153.    To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any significant revisions or modifications to the patient's treatment plan.

154.    It is claimed that 16 minutes were dedicated to the provision of psychotherapy. Patient 5's chart simply states: "__16__ minutes of therapy discussing: _____supportive

therapy and coping skills, journal use (food, anxiety sx) using MI and active listening." These notes do not comply with the minimum documentation requirements for billing code 90833.

155.    Patient 5's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

156.    More accurately the visit only qualified for CPT code 99212.  With respect to the patient's history, the HPI was "extended," the ROS was "extended" and the PHSH was "complete," so the type of history was "comprehensive."   With respect to the exam component, no bullet points were documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were improving or stable and Kilcrease simply continued or increased the patient's medications.   Labs were ordered but not reviewed, so the data component was "minimal or none." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "straightforward."

157.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 5's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| **99212- Estb. Patient Level 2** | Problem focused | **Problem focused** | **Straightforward** | 10 min |
| 99213- Estb. Patient Level 3 | Expanded problem focused | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | **Comprehensive** | Comprehensive | High complexity | 40  min |

158.   **Patient 6** is a 49 year old female who was seen by Wille on June 17, 2020.  The total time of the encounter was 25 minutes of which 16+ minutes were attributed to providing psychotherapy, which left less than 9 minutes for the provision of E/M services.   The purpose of the visit was for follow up of the patient's MDD, GAD, insomnia and ADHD for medication refills. MHP billed Health First Colorado on July 20, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

159.   To begin with, arguably the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any significant revisions or modifications to the patient's treatment plan.

160.   It is claimed that 16+ minutes were dedicated to the provision of psychotherapy. Patient 6's chart states: "16+ minutes of therapy discussing: mood management, medication plan moving forward."  These notes do not comply with the minimum documentation requirements for billing code 90833.

161.   Another way to look at this chart is that the 16+ minutes were not psychotherapy but were for development of a treatment plan, in which case the H0032 charge would be appropriate but the 90833 charge would not be.

162.   Patient 6's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

163.   More accurately the visit only qualified for CPT code 99212.  With respect to the patient's history, the HPI was "extended," no ROS was documented, but credit is provided for the documented psyche history, so the ROS was "problem pertinent" and the PHSH was "pertinent," so the type of history was "expanded problem focused" because all three elements must be met.  With respect to the exam component, no bullet points were documented, so the

type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were improving, with one exception, and Wille simply continued the patient's medications, with one exception.   Labs were not ordered or reviewed, so the data component was "minimal or none." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "straightforward."

164.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 6's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| **99212- Estb. Patient Level 2** | Problem focused | **Problem focused** | **Straightforward** | 10 min |
| 99213- Estb. Patient Level 3 | **Expanded problem focused** | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

165.    **Patient 7** is a 29 year old female who was seen remotely by Precious Barnes APRN ("Barnes") on August 28, 2020.  The total time of the encounter was 30 minutes of which 16 minutes were attributed to providing psychotherapy, which left 14 minutes for the provision of E/M services.   The purpose of the visit was for follow up medication management for the patient's anxiety, depression and PTSD. MHP billed Health First Colorado on September 3, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

166.     To begin with, arguably the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any significant revisions or modifications to the patient's treatment plan.

167.     It is claimed that 16 minutes were dedicated to the provision of psychotherapy. Patient 7's chart states: "Provided psychotherapy for 16 mins applying the following therapeutic maneuver: empathetic listening, coping skills and sleep hygiene discussed."  These notes do not comply with the minimum documentation requirements for billing code 90833.

168.     Patient 7's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

169.     More accurately the visit only qualified for CPT code 99213.  With respect to the patient's history, the HPI was "extended," no ROS was documented, but credit is provided for the documented psyche history, so the ROS was "problem pertinent" and the PHSH was "complete," so the type of history was "expanded problem focused" because all three elements must be met.  With respect to the exam component, less than five bullet points were documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were improving, with one exception, and Barnes made one change in medication, but otherwise kept the treatment program the same.   Labs were not ordered or reviewed, but Barnes did have to interpret a screening for autism so the data component was "limited." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "low complexity."

170.   Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 6's services only qualified for use of the 99213 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| 99212- Estb. Patient Level 2 | Problem focused | **Problem focused** | Straightforward | 10 min |
| **99213- Estb. Patient Level 3** | **Expanded problem focused** | Expanded problem focused | **Low complexity** | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

171.   **Patient 8** is a 33 year old female who was seen remotely by Valerie Baunoch APRN ("Baunoch") on September 10, 2020.  The total time of the encounter was 35 minutes of which 20 minutes were attributed to providing psychotherapy, which left 15 minutes for the provision of E/M services.   The purpose of the visit was for follow up evaluation of the patient's bipolar disorder, depression and anxiety. MHP billed Health First Colorado on September 21, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

172.   To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any significant revisions or modifications to the patient's treatment plan.

173.   It is claimed that 20 minutes were dedicated to the provision of psychotherapy. Patient 8's chart states: "Provided psychotherapy for 20 mins applying the following therapeutic maneuver: Supportive therapy, coping skills, safety planning, substance use, anxiety and stress management." These notes do not comply with the minimum documentation requirements for billing code 90833.

174.    Patient 8's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

175.    More accurately the visit only qualified for CPT code 99212.  With respect to the patient's history, the HPI was "extended," no ROS was documented, but credit is provided for the documented psyche history, so the ROS was "problem pertinent" and the PHSH was "complete," so the type of history was "expanded problem focused" because all three elements must be met.  With respect to the exam component, no bullet points were documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were improving, with one exception, and Baunoch made modest adjustments to the medication.   Labs were not ordered or reviewed, and the review of other data was not documented so the data component was "minimal or none." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "straightforward."

176.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 8's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| **99212- Estb. Patient Level 2** | Problem focused | **Problem focused** | **Straightforward** | 10 min |
| 99213- Estb. Patient Level 3 | **Expanded problem focused** | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

177.    **Patient 9** is a 39 year old female who was seen remotely by Baunoch on September 10, 2020.  The total time of the encounter was 30 minutes of which 16 minutes were attributed to providing psychotherapy, which left 14 minutes for the provision of E/M services. The purpose of the visit was for follow up of the patient's bipolar disorder, GAD and PTSD. MHP billed Health First Colorado on September 10, 2020 claiming CPT codes 99215, H0032 and 90833 for a total of $410.00.

178.    To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any significant revisions or modifications to the patient's treatment plan.

179.    It is claimed that 16 minutes were dedicated to the provision of psychotherapy. Patient 9's chart states: "Provided psychotherapy for 16 mins applying the following therapeutic maneuver: supportive therapy, coping skills, safety planning, anxiety and stress management." These notes do not comply with the minimum documentation requirements for billing code 90833.

180.    Patient 9's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99215.

181.    More accurately the visit only qualified for CPT code 99213.  With respect to the patient's history, the HPI was "extended," the ROS was "extended" and the PHSH was "complete," so the type of history was "comprehensive."  With respect to the exam component, no bullet points were documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "limited" as the patient's diagnoses had been previously established, the patient's symptoms were improving or at a level that did not require significant adjustments in the treatment plan, and no changes were

made in the medications.   Labs were not ordered or reviewed, so the data component was "minimal or none." And, the risk of complications or morbidity was "minimal."  So the type of MDM was "low complexity."

182.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements be met, Patient 9's services only qualified for use of the 99213 code:

| Code | History | Exam | Medical Decision Making | Time |
|------|---------|------|-------------------------|------|
| 99212- Estb. Patient Level 2 | Problem focused | **Problem focused** | Straightforwar**d** | 10 min |
| **99213- Estb. Patient Level 3** | Expanded problem focused | Expanded problem focused | **Low complexity** | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | **Comprehensive** | Comprehensive | High complexity | 40  min |

183.    **Patient 10** is an 8 year old male who was seen by Wille on July 7, 2020, in the company of his mother.  The total time of the encounter was 25 minutes of which 16 minutes were attributed to providing psychotherapy, which left 9 minutes for the provision of E/M services.   The purpose of the visit was for follow up of the patient's medication refills. MHP billed Health First Colorado on August 19, 2020 claiming CPT codes 99214, H0032, 90833 and 90887 for a total of $520.00.

184.    To begin with, the use of CPT code H0032 was false as more than 50% of the encounter was claimed to be for the provision of psychotherapy. In addition, the chart notes do not reflect any significant revisions or modifications to the patient's treatment plan.

185.    The submission of a claim for CPT code 90887 was also false.  Code 90887 requires that the provider interpret the results of any psychiatric examinations and procedures, as

well as any other pertinent recorded data and spend time explaining the patient's condition, separate and apart from the provision of psychotherapy to the patient. The minimum documentation requirements include providing a summary of the test results, interpretation of test results and discussion with the individual about the results. Colorado 2017 USCSM, p. 99. Patient 10's chart does not document that any test results were discussed with Patient 10's mother.

186.    It is claimed that 16 minutes were dedicated to the provision of psychotherapy. Patient 10's chart states: "16 minutes of therapy discussing: sleep issues, mood management, aggression and benefit with CBD." These notes do not comply with the minimum documentation requirements for billing code 90833.

187.    Patient 10's chart does not support MHP's claim that E/M services were provided at a level that justified claiming CPT code 99214.

188.    More accurately the visit only qualified for CPT code 99212. With respect to the patient's history, the HPI was marginal but will be considered "extended," no ROS was documented, but credit will be provided for the discussion of the patient's symptoms so the ROS will be considered "problem pertinent." No PHSH was documented so that component will be considered "n/a." Therefore, the type of history was "problem focused." With respect to the exam component, no bullet points were documented, so the type of exam was "problem focused." And with respect to the MDM component, the number of diagnoses or management options were "minimal" as the patient's diagnoses had been previously established, the patient's symptoms were stable or improving, and no significant changes were made to the treatment plan or the patient's medications. Labs were not ordered or reviewed, so the data component was

"minimal or none." And, the risk of complications or morbidity was "minimal." So the type of

MDM was "straightforward."

189.    Utilizing the grid established by the 1995 and 1997 CMS E/M guidelines and the

Colorado 2017 and July 2020 USCSM regulations, which requires that two of the three elements

be met, Patient 10's services only qualified for use of the 99212 code:

| Code | History | Exam | Medical Decision Making | Time |
|---|---|---|---|---|
| **99212- Estb. Patient Level 2** | **Problem focused** | **Problem focused** | **Straightforward** | 10 min |
| 99213- Estb. Patient Level 3 | Expanded problem focused | Expanded problem focused | Low complexity | 15 min |
| 99214- Estb. Patient Level 4 | Detailed | Detailed | Moderate complexity | 25 min |
| 99215- Estb. Patient Level 5 | Comprehensive | Comprehensive | High complexity | 40  min |

190.    These ten patient examples are not exclusive.  Additional patient examples exist,

and the documentation with respect to more are in the possession of the Defendants and will be

obtained through discovery.

**C.  Conclusions:**

191.    The Defendants' actions were clearly "knowingly false."  A diligent

understanding of the applicable regulations and billing requirements of the GHPs would have led

any reasonable person to understand that the bills MHP submitted to the GHPs were false.

192.    Moreover, the manner in which Chism hired uneducated, inexperienced and

poorly trained individuals to code and audit these bills, and how Chism made those individuals

dependent on his incorrect instructions for billing demonstrates that Chism's and MHP's actions

were made with actual knowledge of their falsity, were submitted with deliberate ignorance of

the truth or falsity of their accuracy and/or were submitted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(B).

193.    In addition, the manner in which the Defendants pressured their nurse practitioners to falsely prescribed unnecessary controlled substances and then require the patients to be seen at MHP more frequently than necessary demonstrates that the Defendants' actions were made with actual knowledge of their falsity, were submitted with deliberate ignorance of the truth or falsity of their accuracy and/or were submitted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(B).

194.    The Defendants were also placed on notice by multiple employees that they were engaging in fraud and were grossly overbilling GHPs.  For example, former employee Josh Parrish notified MHP's CFO that MHP was overbilling patients and that this billing practice should be stopped.

195.    And, these false submissions were also "material."  If the responsible individuals with authority within the government had been aware of the Defendants' fraudulent scheme underlying the submitted patient bills, the government would not have paid MHP. At a minimum, knowledge by the responsible government individuals with authority of the Defendants' false claims would have had a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

## IX.   FIRST CLAIM FOR RELIEF
## FCA LIABILITY, 31 U.S.C. § 3729(a)(1)(A)-(B), (G)

196.    The Relator incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

197.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 – 3733.

198.    On or about January 1, 2017 and continuing until the present and beyond, the Defendants, individually and by and through the entities they own and control, including MHP, knowingly presented, or caused to be presented, one or more false or fraudulent claim for payment or approval.

199.    The submission of these false claims was knowingly false as defined by the FCA.

200.    The submission of these false claims was material as defined by the FCA.

201.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

202.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

203.    By virtue of the acts described above, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G) by failing to refund the fraudulently obtained federal crop insurance benefits they received.

204.    Relators cannot now identify all of the false claims for payment that Defendants presented or caused to be presented, or the false records or statements Defendants made or used,

or caused to be made or used, in support of such claims because Relators do not have access to all of the records in Defendants' or third parties' possession.

205.    The United States, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

206.    The United States, unaware that Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the government, did not collect from Defendants monies that it would have collected but for Defendants' unlawful conduct.

207.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

208.    Additionally, the United States is entitled to the maximum penalty under 31 U.S.C. §3729, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

## X.      SECOND CLAIM FOR RELIEF – COLORADO MEDICAID FALSE CLAIMS ACT C.R.S. § 25.5-4-305(1)(a)-(b), (f)

209.    The Relator incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

210.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. 25.5-4-303.5 – 25.5-4-310.

211.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the State of Colorado, in violation of Colo. Rev. Stat. 25.5-4-305(1)(a).

212.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of Colo. Rev. Stat. 25.5-4-305(1)(b).

213.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the state or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. 25.5-4-305(1)(f).

214.    Relators cannot now identify all of the false claims for payment that Defendants presented or caused to be presented, or the false records or statements Defendants made or used, or caused to be made or used, in support of such claims because Relators do not have access to all of records in Defendants' or third parties' possession.

215.    The State of Colorado, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay claims that would not be paid but for Defendant's illegal conduct.

216.    The State of Colorado, unaware that Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, did not collect from the Defendants monies that it would have collected but for Defendants' illegal conduct.

217.    Defendants have damaged, and continue to damage, the State of Colorado in a substantial amount to be determined at trial.

218.    Additionally, pursuant to Colo. Rev. Stat. 25.5-4-305(1), the State of Colorado is

entitled to the maximum penalty under the Colorado Medicaid Statute, as adjusted, for each and every violation alleged herein.

## XI.     THIRD CLAIM FOR RELIEF – TEXAS MEDICAID FRAUD PREVENTION ACT TEX. HUM.RES.CODE § 36.002

219.    The Relator incorporates by reference the prior allegations of this Complaint, as though more fully set forth herein.

220.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, et. seq.

221.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the State of Texas, in violation of Tex. Hum. Res. Code § 36.002.

222.    By virtue of the acts described above, Defendants knowingly made, or caused to be made, a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized in violation of Tex. Hum. Res. Code § 36.002(1).

223.    By virtue of the acts described above, Defendants knowingly concealed or failed to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of Tex. Hum. Res. Code § 36.002(2).

224.    By virtue of the acts described above, Defendants knowingly made, used, or caused the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or

property to the state of Texas under the Medicaid program in violation of Tex. Hum. Res. Code § 36.002(12).

225.    Relators cannot now identify all of the false claims for payment that Defendants presented or caused to be presented, or the false records or statements Defendants made or used, or caused to be made or used, in support of such claims because Relators do not have access to all of records in Defendants' or third parties' possession.

226.    The State of Texas, unaware of the falsity of the records, statements, and claims that Defendant made or caused to be made, paid and continues to pay claims that would not have been paid but for Defendant's illegal conduct.

227.    The State of Texas, unaware that Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the state, did not collect from the Defendants monies that it would have collected but for Defendants' illegal conduct.

228.    Defendants have damaged, and continue to damage, the State of Texas in a substantial amount to be determined at trial.

229.    Additionally, pursuant to Tex. Hum. Res. Code § 36.052 and § 36.102, the State of Texas is entitled to the maximum penalty under the Texas Medicaid Fraud Prevention Act, as adjusted, for each and every violation alleged herein.

.

## XII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Relator, Krystin Butler, on behalf of the United States, the State of

Colorado and the State of Texas requests: (a) that the United States Government, , the State of

Colorado and the State of Texas recover from the Defendants all sums which they improvidently

paid as a result of the Defendants' actions, including interest thereon; (b) that the damages

described in (a) be trebled as provided in 31 U.S.C. § 3729(a); (c) that the maximum civil

penalty be assessed against the Defendants for each false claim, record or statement submitted

directly or indirectly to the Government as a result of its wrongful actions; (d) that the Court

award the Relator all amounts as are permitted under 31 U.S.C. § 3730(d) and the similar false

claims acts of the State of Colorado and the State of Texas, including an appropriate share of any

sums recovered and benefits obtained in this action, now or in the future, along with the

Relator's reasonable expenses, attorney fees, and costs incurred herein; and (e) that the Court

grant any additional appropriate relief with respect to this *qui tam* action.

**THE RELATOR DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this Monday, February 08, 2021.

THE LAW FIRM OF MICHAEL S. PORTER LLC

By:      <u>s/ Michael S. Porter</u>
Michael S. Porter, Esq.
4350 Wadsworth Blvd., Suite 300
Wheat Ridge, CO  80033
Telephone:  (303) 940-8370
Fax:    (720) 512-4918
E-mail: porterlaw@comcast.net

**ATTORNEY FOR THE RELATOR**
**KRYSTIN BUTLER**

<u>Relator's address:</u>
359 North Potomac Circle, Apt. E-207
Aurora, CO 80011

54